IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

**ANDREW MCKINNON,**

       **Plaintiff,**

v.

**DENNIS LARSON,**

       **Defendant.**

Case No. 3:20-CV-00699-NJR

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

      While incarcerated at Big Muddy River Correctional Center ("Big Muddy"), Plaintiff Andrew McKinnon suffered a nasty slip and fall resulting in pain in his left knee. (Docs. 78-1, pp. 16-20; 78-3, pp. 1, 26). Immediately after the spill, McKinnon received treatment from a non-party nurse who provided him with a crutch, cold pack, and pain medication. (Docs. 78-1, p. 22; 78-3, p. 1). Two days later, on April 23, 2019, McKinnon saw a non-party physician assistant ("PA") who evaluated him, ordered an x-ray of the left knee, issued a low bunk and low gallery permit, and prescribed a wheelchair. (Docs. 78-1, pp. 22-25; 78-3, pp. 2, 27). The PA noted that McKinnon already had active prescriptions for Ibuprofen/Tylenol and Neurontin, a nerve pain medication. (Doc. 78-3, p. 2). An x-ray was completed onsite the same day. (*Id.* at pp. 3, 23). The reviewing radiologist noted that mineralization seemed normal, the joint spaces were intact, no fracture or dislocation was present, and the soft tissues appeared unremarkable. (*Id.* at p. 23).

Three weeks later, McKinnon met with Defendant Dr. Dennis Larson for pain in his left knee, back, and right elbow. (*Id.* at p. 3; Doc. 78-4, ¶ 5). Larson performed a physical examination and observed normal flexion and extension in the right elbow and tenderness to touch in McKinnon's knee. (Docs. 78-3, p. 3; 78-4, ¶ 6). For treatment, Larson referred McKinnon into physical therapy ("PT") for evaluation. (Doc. 78-3, p. 3).

McKinnon next saw Larson 15 days later on May 29, 2019. (*Id.* at p. 6; Doc. 78-4, ¶ 8). In the meantime, McKinnon requested a cane and wheelchair instead of a crutch from a non-party nurse. (Doc. 78-3, p. 5). The nurse also prescribed a limited dose of Acetaminophen and Ibuprofen. (*Id.*). During his appointment with Larson, McKinnon continued to complain of left knee and back pain. (*Id.* at pp. 6-7). Larson ordered an x-ray of McKinnon's spine. (*Id.*; Doc. 78-4, ¶ 8). He also continued McKinnon's permitted use of a cane and wheelchair for three months. (Docs. 78-3, pp. 6-7, 28; 78-4, ¶ 8). The next day, McKinnon received an onsite x-ray of his thoracic and lumbar spine. (Doc. 78-3, pp. 8, 24). The x-ray revealed no acute bony injury, mild degenerative changes in the upper lumbar spine, grossly unremarkable vertebral body heights and disc spaces in the thoracic and lumbar spine, and suboptimal radiographs of the thoracic spine. (*Id.* at p. 24).

McKinnon reported to nurse sick call in mid-June to inquire about his PT referral. (*Id.* at p. 8). On June 25, 2019, Larson examined McKinnon again. (*Id.* at p. 9; Doc. 78-4, ¶ 13). In that appointment, McKinnon continued to describe pain in his lower back and between his shoulders mentioning his attempts to perform motion exercises. (Doc. 78-3, pp. 9, 21). Larson again referred McKinnon into PT for development of a home exercise plan ("HEP"). (*Id.* at p. 9; Doc. 78-4, ¶ 13). The next day, McKinnon met with a non-party physical

therapist. (Doc. 78-3, p. 21). The physical therapist charted McKinnon's complaints of hip stiffness along with low and mid back pain. (*Id.*). He also indicated that McKinnon no longer suffered from knee pain. (*Id.*). During the session, McKinnon performed motions like walking, standing up, squatting, and some strength exercises. (*Id.*). The physical therapist assessed that McKinnon had general back and hip stiffness and instructed him to perform hip rotations and bilateral lower trunk rotations three times per day along with progression walking on his crutch. (*Id.*). The physical therapist recommended follow-up in six to eight weeks. (*Id.*). Larson endorsed this plan. (*Id.*; Doc. 78-4, ¶ 14).

In early July 2019, McKinnon complained of right elbow pain after performing his therapy exercises. (Doc. 78-3, p. 11). During a consultation with a non-party nurse, McKinnon reported a seven to eight out of ten pain level for two days, that subsequently reduced to a one. (*Id.*). The nurse prescribed a cold pack and a short supply of Acetaminophen and Ibuprofen. (*Id.*). Days later, McKinnon saw Larson again. (*Id.* at p. 12). Larson charted the reported elbow pain and ordered an x-ray. (*Id.*; Doc. 78-4, ¶ 15). McKinnon received an onsite x-ray the day after his appointment with Larson, which revealed no fracture or dislocation, intact joint spaces, calcification at the enthesis of triceps tendon, and no acute abnormality. (Doc. 78-3, pp. 12-13, 25). On July 12, 2019, McKinnon had an unrelated appointment with a non-party PA for his allergies. (*Id.* at p. 13). In early August 2019, McKinnon saw Larson again for the ongoing right elbow pain, and Larson instructed him to take pain medication as needed. (*Id.* at p. 14; Doc. 78-4, ¶ 17). Later that month, a non-party nurse evaluated McKinnon after he reported back and shoulder pain that rated an eight out of ten. (Doc. 78-3, pp. 15-16). The nurse directed McKinnon to avoid

sporting activities, begin gentle strengthening exercises, take warm showers, and return to sick call if symptoms persisted. (*Id.* at p. 16). Shortly after that visit, McKinnon met with a non-party PA to discuss his ongoing back pain. (*Id.* at p. 17). The PA noted that Larson recently renewed McKinnon's Tylenol/Ibuprofen and Neurontin prescriptions. (*Id.*). The PA referred McKinnon to PT and instructed him to continue his HEP. (*Id.*).

In mid-September 2019, McKinnon put in for nurse sick call to inquire about his upcoming PT appointment. (*Id.* at p. 18). The following month, McKinnon met again with a physical therapist who evaluated his progress. (*Id.* at p. 22). The physical therapist recorded that McKinnon's trunk range of motion fell within functional limits and that he had a steady gait with good balance. (*Id.*). Ultimately, the physical therapist discontinued McKinnon's PT but urged him to continue his HEP three times a day to prevent stiffness, hip pain, and back pain. (*Id.*). For the second time, Larson endorsed this plan. (*Id.*; Doc. 78-4, ¶ 18). McKinnon also saw a PA to discuss a colonoscopy around that time. (Doc. 78-3, p. 19). There are no further medical records that indicate McKinnon received medical attention for back, elbow, or knee pain between October 2019 and McKinnon's release from Big Muddy. In June 2021, McKinnon completed his sentence. After IDOC's custody terminated, McKinnon began supervised release. (Docs. 53, ¶ 4; 78-1, pp. 9, 35-37).

After his release, McKinnon again sought medical treatment for his low back pain. In October 2021, McKinnon saw Dr. Daria Terrell, who referred him to PT and provided a prescription for Naproxen. (Doc. 78-5, pp. 5-7). Three months later, Dr. Terrell followed up with McKinnon after his participation in PT, assessed a strain of the lumbar region, instructed McKinnon to continue in his HEP, and ordered a follow-up appointment in two

months. (*Id.* at pp. 8-9). After a referral from Dr. Terrell, in February 2022, McKinnon saw a different provider, Dr. James Diesfeld, for intense and chronic low back pain. (*Id.* at pp. 3-4). McKinnon met with Dr. Diesfeld twice more in March and April 2022. (*Id.* at pp. 1-2). Dr. Diesfeld provided McKinnon with a back brace. (*Id.* at p. 4). He also administered an epidural steroid injection to McKinnon, which resulted in 50 percent pain relief for one week. (*Id.* at pp. 1-2).[1]

Larson engaged an expert physician, Dr. Kenneth Breger, to review McKinnon's medical records and form an opinion as to the care provided by Larson. (Docs. 78-6; 78-7). Ultimately, Dr. Breger opined that McKinnon's medical records did not indicate insufficient care or treatment during McKinnon's stint at Big Muddy. (Doc. 78-7).

In July 2020, McKinnon filed this action *pro se* pursuant to 42 U.S.C. § 1983 alleging his constitutional rights were violated while incarcerated at Big Muddy. (Doc. 1). This action proceeds on one count of deliberate indifference to a serious medical need in violation of the Eighth Amendment against Larson. (Docs. 53; 69). McKinnon alleges that Dr. Larson exhibited deliberate, reckless, or callous indifference to McKinnon's serious medical needs and pain. (Doc. 53). In August 2021, the Court appointed counsel for McKinnon.[2] (Doc. 50). Larson now moves for summary judgment arguing that McKinnon

---

[1] Over a year later, in May and June 2023, McKinnon received a CT scan and MRI related to his low back pain, which revealed spinal stenosis at L2-L3 and L4-L5. (Docs. 82-2; 82-3, pp. 2-3). His treating physician at the time referred McKinnon to a neurosurgical spine surgeon for further evaluation. (Doc. 82-1, p. 4). McKinnon attached the corroborating medical records to his response to the motion for summary judgment. These records, however, were never exchanged during discovery, and the relevant appointments actually occurred after the close of discovery.

[2] The initially appointed counsel eventually withdrew, and the Court appointed new counsel in July 2022. (Docs. 72; 73).

has failed to produce any evidence demonstrating deliberate indifference. (Docs. 77; 78; 83). McKinnon filed a response in opposition. (Doc. 82). For the reasons set forth below, Larson's motion is granted.

## LEGAL STANDARD

Summary judgment is proper only if the moving party can demonstrate, through pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The moving party bears the burden of establishing that no material facts are in genuine dispute; any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *see also Lawrence v. Kenosha County*, 391 F.3d 837, 841 (7th Cir. 2004). A fact is material if it might affect the outcome of a suit under the relevant substantive law. *Ruffin-Thompkins*, 422 F.3d at 607.

Once the moving party sets forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp.*, 477 U.S. at 322-24. A moving party is entitled to judgment as a matter of law where the nonmoving party "failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp.*, 477 U.S. at 323. The party opposing summary judgment must offer admissible evidence in support of his

version of events; hearsay evidence does not create a genuine issue of material fact and cannot be considered on summary judgment. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009); *see also Prude v. Meli*, 76 F.4th 648, 661 (7th Cir. 2023).

To determine if a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the nonmovant. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). But "[i]nferences that rely upon speculation or conjecture are insufficient." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (internal citation omitted).

## DISCUSSION

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Prison officials, including physicians or medical staff, violate the Eighth Amendment only when two requirements are met—the alleged deprivation is objectively, sufficiently serious, and the prison official had a sufficiently culpable state of mind. *Thomas v. Martija*, 991 F.3d 763, 768 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). To succeed on a claim of deliberate indifference in the medical context, a plaintiff must show: (1) that he suffered from an objectively serious medical condition; and (2) that the individual defendant was deliberately indifferent to that condition. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (citing *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006)); *see also Arnett v. Webster*,

658 F.3d 742, 750 (7th Cir. 2011). Of course, a prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm"—not to demand specific care or receive the best care possible. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

For the first prong, a medical condition is objectively serious if "a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Lockett v. Bonson*, 937 F.3d 1016, 1022-23 (7th Cir. 2019) (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)). It is not necessary for such a medical condition to "be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010); accord *Farmer*, 511 U.S. at 836 (violating the Eighth Amendment requires "deliberate indifference to a *substantial* risk of *serious* harm" (internal quotation omitted) (emphasis added)).

Prevailing on the second prong requires a prisoner to show that a prison official had subjective knowledge of—and then disregarded—an excessive risk to the inmate's health. *Arnett*, 658 F.3d at 751. The plaintiff need not show the individual "literally ignored" his complaint, but that the individual knew of the condition and either intentionally or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). Deliberate indifference involves intentional or reckless conduct, not mere medical negligence or malpractice. *Pyles*, 771 F.3d at 409; *Berry*, 604 F.3d at 440.

Assessing the second prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir.

2016). This is in contrast to a case "where evidence exists that the defendant [ ] knew better than to make the medical decision[ ] that [he] did." *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016) (alterations in original)). Further, a prisoner's dissatisfaction with a medical professional's prescribed course of treatment does not give rise to a successful deliberate indifference claim unless the treatment is "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). "[T]he Eighth Amendment does not reach disputes concerning the exercise of a professional's medical judgment, such as disagreement over whether one course of treatment is preferable to another." *Cesal v. Moats*, 851 F.3d 714, 721 (7th Cir. 2017) (citing *Snipes*, 95 F.3d at 591). To show deliberate indifference, a medical provider's treatment decision must depart so radically from accepted professional judgment, practice, or standards for a jury to reasonably infer that the decision was not based on professional judgment. *Whiting*, 839 F.3d at 663.

Here, the parties do not waste time arguing over whether McKinnon experienced a serious medical condition. While Larson states that McKinnon's condition was debatably not a serious medical need, he drops the issue and elects to focus on the subjective prong of the deliberate indifference claim. As such, the Court will assume, for the purpose of its analysis, that McKinnon suffered an objectively serious medical condition with his knee and elbow pain, along with his chronic back pain. The remaining dispute concerns whether Larson acted with the requisite mental state of deliberate

indifference, especially in declining to further investigate the source of McKinnon's pain by scheduling an offsite x-ray or MRI.

Larson argues that the record establishes the opposite of deliberate indifference—that he responded to McKinnon's complaints of back, shoulder, knee, and elbow pain through numerous tests and treatments, including multiple x-rays, a lower bunk permit, a wheelchair, a cane, PT, and pain medication. According to Larson, he exercised appropriate professional judgment in choosing this course of treatment. In support of this argument, Larson points to McKinnon's post-incarceration treatment by Dr. Terrell who took nearly identical steps (x-rays, PT, and over the counter medication) to treat McKinnon's chronic back pain. Larson also highlights that he provided treatment in conjunction with other providers, the nurses, PA, and physical therapist involved in McKinnon's care, who administered cold and hot treatments, advised him to continue his HEP, and also prescribed pain medications and low bunk/gallery permits. Finally, Larson contends that McKinnon cannot connect his current condition of spinal stenosis to any alleged lack of care over four years ago.

McKinnon argues that Larson did nothing to investigate or treat the source of his chronic pain. According to McKinnon, Larson simply pushed him down the line until his ultimate release from Big Muddy. McKinnon contends that the diagnostic tools used by Larson, such as onsite x-rays, were fruitless as x-rays cannot show soft tissue injuries like injured discs and ligaments, and the x-ray machine at Big Muddy failed to deliver useful, high-quality images. Lastly, McKinnon argues that after his release from prison he

received a CT scan and an MRI which showed spinal canal stenosis at multiple levels, and he received a surgical referral for this condition.

Even construing all facts and inferences in favor of McKinnon, there is no evidence that Larson acted with deliberate indifference in treating McKinnon's ongoing pain. The record establishes that between May 2019 and August 2019, Larson met with McKinnon five times. In addition to these visits, Larson approved of the physical therapist's recommended treatment plan twice. Each time they met, Larson evaluated McKinnon and prescribed treatments including pain medication, mobility assistance devices like a cane and a wheelchair, x-rays, and PT. Throughout these appointments, McKinnon complained of pain in different areas of his body. Initially, he complained of left knee pain, which eventually subsided. He also reported back and shoulder pain in multiple appointments, as well as elbow pain. Larson examined and prescribed various treatments in light of each of these specific complaints.

In his first appointment with Larson, McKinnon reported left knee pain, back pain, and right elbow pain. Larson performed some physical examinations and referred McKinnon into PT. In their next visit, Larson ordered x-rays of the thoracic and lumbar spine and prescribed a cane and wheelchair for three months in response to McKinnon's complaints of knee and back pain. In their third appointment, McKinnon described lower back pain and pain between his shoulders. Larson renewed his PT referral, as apparently the prior referral was never scheduled. During the fourth visit, McKinnon complained of right elbow pain, and Larson ordered an x-ray. In their final visit, McKinnon continued to complain of right elbow pain. In response, Larson advised McKinnon to take pain

medication as needed. The record indicates that Larson periodically renewed McKinnon's Tylenol and Neurontin prescriptions along with his access to a cane and wheelchair. After his last appointment with Larson, McKinnon remained in custody at Big Muddy for another year and a half. During that time, he did not raise any further complaints about his ongoing back pain. This treatment record does not demonstrate that Larson knew of and disregarded an excessive risk to McKinnon's health.

Offsite radiologists reviewed the x-rays, and Larson used their reported findings to inform his treatment plan. For McKinnon's back, the radiologist's report indicated that the x-ray of the spine displayed no acute bony injury, mild degenerative changes in the upper lumbar spine, grossly unremarkable vertebral body heights and disc spaces in the thoracic and lumbar spine, and suboptimal radiographs of the thoracic spine. The x-ray of the right elbow showed no fracture or dislocation, intact joint spaces, calcification at the enthesis of triceps tendon, and no acute abnormality. Nothing in these x-rays alerted Larson to the need for further diagnostic procedures. Even the reference to a suboptimal radiograph of the thoracic spine does not necessitate that Larson immediately order another x-ray of that area. The reports do not indicate that any of the scans were unusable.

McKinnon urges that Larson did not properly investigate the source of his chronic pain and should have ordered a CT, MRI, or other procedure to uncover the pain's cause and render an effective treatment. But "[a]n MRI is simply a diagnostic tool, and the decision to forego diagnostic tests is 'a classic example of a matter for medical judgment.'" *Pyles*, 771 F.3d at 411 (quoting *Estelle*, 429 U.S. at 107). Even if McKinnon argues that PT, pain medications, and ambulatory assistance devices are insufficient treatment, this is

simply a disagreement as to the appropriate course of care. Further, to infer deliberate indifference on the basis of a physician's treatment decision, the decision must be "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Collignon v. Milwaukee County*, 163 F.3d 982, 987-88 (7th Cir. 1998) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 322-23 (1982)). Such is not the case here. As Larson emphasizes, McKinnon's treating physician after he left Big Muddy chose the same conservative approach to treat his complaints of chronic back pain. Dr. Terrell ordered an x-ray, recommended PT, and prescribed Naproxen. As such, no reasonable jury could infer that Larson's treatment decisions substantially departed from accepted professional judgment, practice, or standards.

After McKinnon was referred to a pain specialist, Dr. Diesfeld administered an epidural steroid injection to McKinnon's spine and fit him for a back brace. McKinnon reported a 50 percent pain relief for one week. With these more aggressive treatment options, McKinnon still did not have long-term relief from his back pain. McKinnon also submitted recent medical records, not produced in discovery, demonstrating that a physician referred him for a surgical consult after an MRI revealed spinal stenosis in multiple areas. Even if the Court considered these records, which were generated after the close of discovery, McKinnon does not offer evidence that he suffered from this condition while at Big Muddy four years earlier, that surgical intervention is a required treatment, or that pain medication and PT are inappropriate treatments for spinal stenosis.

On this evidence, no reasonable jury could find that Larson acted with deliberate indifference to McKinnon's serious medical need. As such, Larson is entitled to summary judgment.

## CONCLUSION

For these reasons, the motion for summary judgment filed by Defendant Dennis Larson (Doc. 77) is **GRANTED**. The Clerk of Court is **DIRECTED** to enter judgment and close this case.

**IT IS SO ORDERED.**

**DATED:  February 13, 2024**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**